LUDWIG HONOLD MFG. CO.

v.

**Harold A. FLETCHER and United Automobile Workers, Local 416, Appellants,**

No. 17087.

United States Court of Appeals Third Circuit.

Argued Oct. 22, 1968.

Decided Jan. 14, 1969.

See also, D.C., 260 F.Supp. 917.

Richard J. Hobin, Philadelphia, Pa., for appellants.

Robert F. Jackson, Media, Pa., for appellee.

Before HASTIE, Chief Judge, and SEITZ and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The District Court vacated a labor arbitration award in a grievance case which involved a plant promotion. It held that the arbitrator had exceeded his authority in the interpretation of the collective bargaining agreement.

Fletcher, the employee who won the award, and his union, Local 416, have appealed from the order of the court below, 275 F.Supp. 776.[1]

■ Initially, it should be emphasized that this case does not involve the question of the arbitrability of the dispute.

We are not to decide whether the arbitrator had the power or jurisdiction to hear the grievance in question.[2] The parties agree that the grievance was a proper subject of arbitration. The controversy arises over the arbitrator's interpretation of provisions of the agreement, specifically, that portion governing the promotion of personnel within certain job classifications.

### I.

Before reaching the issue of whether the District Court erred in vacating the award, we have this threshold question to consider: what is the proper role of a court in reviewing an arbitrator's interpretation of provisions of a collective bargaining agreement?

■ The Supreme Court has addressed itself to this specific point in United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960): "It is the arbitrator's construction which was bargained for and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." [3]

"Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, *yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement.* When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award."

---

1. This case originated in the Court of Common Pleas of Delaware County, Pennsylvania, with plaintiff filing a rule to show cause why an arbitration award should not be set aside. It was removed to the District Court for the Eastern District of Pennsylvania upon petition of the defendants pursuant to § 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185.

2. Whether a grievance is arbitrable depends upon whether the parties agreed to submit the particular dispute to arbitration. See, e. g., United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed. 2d 1409 (1960); United Steelworkers of America v. America Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

3. 363 U.S. at 599, 80 S.Ct. at 1362.

363 U.S. at 597, 80 S.Ct. at 1361 (emphasis supplied).

█ *Enterprise* enunciated a basic philosophy that was to apply to all labor arbitration cases. It elevated the arbitrator to an exalted status—emphasizing that there would be no interference with his award simply because a reviewing court differed with him in its interpretation of provisions of the contract. At the same time, it held a checkrein on him—confining his zone of action to the four corners of the collective bargaining agreement. Although the language setting forth these guidelines was precise and uncomplicated, one problem has emanated from the cases which have followed *Enterprise*: that of formulating a consistent and workable standard to be utilized by the courts in exercising the function of review. Circuit and District Court decisions have not exuded uniformity in translating the "essence" test into a pronouncement of the appropriate extent or limitation of judicial review of the arbitrator's interpretation.

Each case seems to have fashioned its own standard, and among those variously employed have been: the reviewing court should not disturb the award so long as the interpretation was not arbitrary,[4] or "even though the award permits the inference that the arbitrator may have exceeded his authority",[5] or merely because it believes that sound

legal principles were not applied;[6] the court should interfere "where the arbitrator clearly went beyond the scope of the submission",[7] or where "the authority to make * * * award cannot be found or legitimately assumed from the terms of the arbitration agreement",[8] or if the arbitrator made a determination not required for the resolution of the dispute.[9]

Three decisions suggest no review whatsoever of the arbitrator's interpretations: construction and interpretation is not for the reviewing court;[10] there should be no review on the merits at all;[11] review is confined to the question of whether the union agreed to arbitrate or give arbitrator power to make the award.[12]

In H. K. Porter Co., Inc. v. United Saw, File and Steel Products Workers of America, etc., 333 F.2d 596, 602 (3 Cir. 1964), this court vacated an arbitrator's award because there was "no ground upon which to base his interpretation".[13]

A comparison of review standards employed in related proceedings merits attention. The National Labor Relations Board has said that in reviewing an arbitrator's award it would "give hospitable acceptance to the arbitral process as 'part and parcel of the collective bargaining process itself,' and voluntarily withhold its undoubted authority to adjudicate [the matter] unless it clearly

4. Local 7–644 Oil, Chemical & Atomic Workers International Union v. Mobil Oil Co., 350 F.2d 708, 712 (7 Cir. 1965).

5. Brotherhood of Railroad Trainmen etc. v. St. Louis Southwestern Ry. Co., 220 F.Supp. 319, 325 (E.D.Tex.1963).

6. Dallas Typographical Union, No. 173 v. A. H. Belo Corp., 372 F.2d 577, 581 (5 Cir. 1967).

7. Textile Workers Union of America, etc. v. American Thread Co., 291 F.2d 894, 897–898 (4 Cir. 1961).

8. Truck Drivers and Helpers Union Local 784 v. Ulry-Talbert Co., 330 F.2d 562, 563 (8 Cir. 1964).

9. Socony Vacuum Tanker Men's Ass'n v. Socony Mobil Oil Co., 369 F.2d 480, 482 (2 Cir. 1966).

10. International Brotherhood of Pulp, Sulphite, and Paper Mill Workers Local Union No. 874 v. St. Regis Paper Co., 362 F.2d 711, 714 (5 Cir. 1966).

11. American Machine & Foundry Co. v. United Auto., Aerospace and Agr. Implement Workers, 256 F.Supp. 161 (S.D. N.Y.1963); aff'd., 329 F.2d 147 (2 Cir. 1964).

12. Western Iowa Pork Co. v. National Brotherhood Packinghouse and Dairy Workers, 366 F.2d 275, 277 (8 Cir. 1966).

13. In *Porter*, we upheld one portion of the award though it was contrary to the literal language of the agreement, because there was a clear pattern of past practice which justified the deviation. 333 F.2d at 601.

appears that the proceedings were tainted by fraud, collusion, unfairness, or serious procedural irregularities." [14]

Reviewing an appeal from a decision of the Railway Adjustment Board, the Supreme Court has ruled that the Board's interpretations must stand unless they are "wholly baseless and completely without reason". [15] Similarly, this court has concluded that a railway award should not be disturbed unless the Board acted unconstitutionally or beyond its jurisdiction. [16]

Although we are quick to recognize that cases involving commercial arbitration disputes under the Federal Arbitration Act [17] are not controlling authority, [18] an examination of standards applied by reviewing courts is invited. It has been held that a "mere error in the law or failure on the part of the arbitrators to understand or apply the law" will not justify judicial intervention, [19] and that the courts' function in confirming or vacating a commercial award is

"severely limited". [20] If it were otherwise, the ostensible purpose for resort to arbitration, i. e., avoidance of litigation, would be frustrated. [21]

The Supreme Court, in Wilko v. Swan, 346 U.S. 427, 436–437, 74 S.Ct. 182, 98 L.Ed. 168 (1953), suggested that an award should be vacated if it is in "manifest disregard of the law", and in Bernhardt v. Polygraphic Co. of America, Inc., 350 U.S. 198, 203, n. 4, 76 S.Ct. 273, 100 L.Ed. 199 (1955), the Court said: "whether the arbitrators misconstrued a contract is not open to judicial review."

Although federal and not state law is controlling in this case, [22] it is not inappropriate to examine those standards of reviewing arbitration awards which have been established by certain states. The Pennsylvania State Arbitration Act provides for a judicial review "[W]here the award is against the law, and is such that had it been a verdict of the jury the court would have entered different or other judgment not-

14. International Harvester Co., 138 N.L.R.B. 923 (1962), aff'd. sub nom. Ramsey v. N. L. R. B., 327 F.2d 784 (7 Cir. 1964). See also Raley's Inc., 143 N.L.R.B. 256, 258 (1963).

15. Gunther v. San Diego & Arizona Eastern Ry. Co., 382 U.S. 257, 261, 86 S.Ct. 368, 371, 15 L.Ed.2d 308 (1965).

16. Barnett v. Pennsylvania-Reading Seashore Lines, 245 F.2d 579, 582 (3 Cir. 1956).

17. 9 U.S.C.A. § 1 et seq. Section 10 of the Act provides, inter alia, that the District Court may order the award vacated "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made".

18. We have previously held that the Federal Arbitration Act is inapplicable to appeals from labor arbitration awards due to the exclusion of "contracts of employment", §§ 1–4. Amalgamated Ass'n of Street, Elec., Ry., & Motor Coach Employees of America v. Pennsylvania Greyhound Lines, Inc., 192 F.2d 310 (3 Cir. 1951). The analogy between the Federal Arbitration Act and the scope of review in labor cases was suggested but declined in Local 719, American Bakery and Confectionery Workers of America v. National Biscuit Co., 378 F.2d 918 (3 Cir. 1967). We choose here merely to pursue the analogy.

19. Saxis Steamship Co. v. Multifacs International Traders, Inc., 375 F.2d 577, 582 (2 Cir. 1967). See also San Martine Compania de Navegacion, S.A. v. Saguenay Terminals Ltd., 293 F.2d 796, 801 (9 Cir. 1961).

20. Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp., 274 F.2d 805 (2 Cir. 1960), cert. den. 363 U.S. 843, 80 S.Ct. 1612, 4 L.Ed.2d 1727 (1960). It will be noted that at the district court level in *Amicizia*, the test adopted was that the arbitrator's award should not be disturbed unless there was "a perverse misconstruction" of the law. 184 F.Supp. 116, 117 (S.D.N.Y.1959).

21. Ibid.

22. Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) held that "the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws."

withstanding the verdict." [23] The New York Court of Appeals has stated that so long as arbitrators do not reach an irrational result, they may "fashion the law to fit the facts before them" and their award will not be set aside because they erred in the determination or application of the law, Matter of Exercycle Corp., 9 N.Y.2d 329, 214 N.Y.S.2d 353, 174 N.E.2d 463 (1961); Marcy Lee Mfg. Co. v. Cortley Fabrics Co., 354 F. 2d 42 (2 Cir. 1965).

■ Under the common law the arbitrators are the final judges of both law and fact and their award will not be disturbed for a mistake of either. Freeman v. Ajax Foundry Products, Inc., 398 Pa. 457, 159 A.2d 708, 709 (1960).

■ Our reference to the area of commercial arbitration has been deliberate, even though we recognize that identical considerations do not apply to the labor field. To the extent that these cases reflect the judicial attitude toward the concept of arbitration, however, they are singularly important in determining the correct standard for the judicial review of labor awards. We are aware of the strong public policy of encouraging the peaceful settlement of industrial disputes by means of the device of arbitration. We are also aware of what has been called the "hostility evinced by courts toward arbitration of commercial agreements".[24]

■■ Bearing this in mind and perceiving that the Supreme Court's announced standards in reviewing commercial awards call for the exercise of judicial restraint, we must conclude that such a philosophy of restricted review compels even less judicial interference in matters arising from labor arbitration. At the very least this means that the interpretation of labor arbitrators must not be disturbed so long as they are not in "manifest disregard" [25] of the law, and that "whether the arbitrators misconstrued a contract" does not open [26] the award to judicial review.

■ Accordingly, we hold that a labor arbitrator's award does "draw its essence from the collective bargaining agreement" if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award.[27]

23. Act of April 25, 1927, P.L. 381, No. 248, § 11 (5 P.S. § 171). Section 170(d) of the Pennsylvania Act provides, inter alia, that a court shall make an order vacating the award where the arbitrators have "exceeded their authority". See also N.J.Stat.Ann., tit. 2A :24–8.

24. In United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574 at 578, 80 S.Ct. 1347 at 1351 (1960), the Court explained the different policy considerations applicable to commercial and labor arbitration cases: "In the commercial case, arbitration is the substitute for litigation. Here arbitration is the substitute for industrial strike. Since arbitration of labor disputes has quite different functions from arbitration under an ordinary commercial agreement, the hostility evinced by courts toward arbitration of commercial agreements has no place here. For arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself."

25. Wilko v. Swan, supra, 346 U.S. at 436, 74 S.Ct. 182.

26. Bernhardt v. Polygraphic Co. of America, Inc., supra, 350 U.S. 198 at 203, 76 S.Ct. 273 at 276.

27. We recognize that this is only one of several possible grounds for vacating an award deemed to be arbitrable. An award may be vacated where it is shown that there was fraud, partiality, or other misconduct on the part of the arbitrator (see, e. g., Commonwealth Castings Corp. v. Continental Coatings Co., et al., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968); San Carlo Opera Co. v. Conley, 72 F. Supp. 825 (D.C.N.Y.1946), aff'd. 163 F. 2d 310 (2 Cir. 1947)); or where the award violates a specific command of some law—usually the National Labor

We now turn to the application of this standard to the case before us.

## II.

Fletcher had been employed in various positions by the Ludwig Honold Manufacturing Company since 1948. On September 29, 1965, he was made a Sheet Metal Specialist A, the job having been posted and bid upon by him as provided in the collective bargaining agreement. The following day McGill was hired by the company and also made a Sheet Metal Specialist A. On November 16, 1965, the job of Sheet Metal Leader was posted and both Fletcher and McGill bid for it. The company gave the job to McGill on November 22, 1965.

Fletcher filed a grievance, contending that he was entitled to be awarded this job because of his seniority. Article XIX of the collective bargaining agreement between the company and the union provided: "Whenever Company determines that a permanent vacancy occurs or a new job is created, notice of such job shall be posted * * * employees with the greatest seniority shall be assigned to fill such jobs provided such employees have the skill and ability to perform the job involved in a satisfactory manner."

The company responded that Fletcher was ineligible for the reason that having been assigned to a new position on September 29, 1965, he could not apply for another one until he had served six (6) months in the prior job. To sustain its position the company relied on the following provision of Article XIX: [28]

"Employees who have applied for such new jobs and have been assigned to fill such jobs will not be eligible to apply for any other posted job for a period of six (6) months from the date of his transfer into such a posted job, or by mutual agreement between Company and Union."

The grievance went to arbitration and the job was awarded to Fletcher.[29] The District Court, 275 F.Supp. 776 vacated the award on the sole ground that Fletcher was ineligible for the position, stating:

"We are concerned, under the arbitrator's award, only with Fletcher's eligibility * * * We are concerned with the express language of the agreement, Fletcher's obvious ineligibility, and the arbitrator's award in violation of the express language of the agreement."

Our initial difficulty with this view is that if the language in the agreement is so inelastic as to make Fletcher ineligible, that same language would seem to disqualify McGill as well.

■ Prior to the November bidding for the job in issue, both applicants had been assigned to new jobs on successive days in September. The arbitrator con-

Relations Act (see, e. g., Glendale Mfg. Co. v. Local No. 520, International Ladies' Garment Workers Union, AFL-CIO, 283 F.2d 936 (4 Cir. 1960)) ; or because the award is too vague and ambiguous for enforcement (see, e. g., Hanford Atomic Metal Trades Council, AFL-CIO v. General Elec. Co., 353 F.2d 302 (9 Cir. 1965)) ; or because of inconsistency with public policy (see, e. g., Black v. Cutter Laboratories, 43 Cal.2d 788, 798, 278 F.2d 905, 911 (1953). But see Local 453 International Union of Elec., Radio and Machine Workers v. Otis Elevator Co., 314 F.2d 25 (2 Cir. 1963).)

28. The company also argued before the arbitrator that Fletcher could not be promoted because promotions can only be awarded within the family of job classifi-

cations within non-interchangeable groups. The jobs of Sheet Metal Specialist A and Sheet Metal Leader are in two different families of non-interchangeable jobs. We observe that if this argument is valid, it also could be advanced against the promotion of McGill.

29. The collective bargaining agreement set forth the jurisdiction of the arbitrator:
"The jurisdiction of the arbitrator shall be limited to a determination of the facts and the interpretation and application of the specific provisions of this agreement at issue. The arbitrator shall be bound by the provisions of this agreement, and shall have no authority to add to, eliminate, amend or modify any of its provisions."

cluded that neither applicant met the literal requirements of Article XIX which provided that "employees * * * will not be eligible to apply for any other posted job for a period of six (6) months from the date of his transfer into such a posted job. * * *" The court below, however, confined its application of the ineligibility requirements to Fletcher alone.[30] We can agree with the court's statement that the language of Article XIX, standing alone, is "unequivocal and unambiguous".[31] But the language by its very terms applies equally to both Fletcher and McGill; and this was the conclusion reached by the arbitrator.

The arbitrator thus was confronted with two interpretations of the agreement: (1) the parties intended that where the only applicants for a position were technically ineligible, the company would exercise a prerogative to make the appointment without regard to other provisions of the collective bargaining agreement; or, (2) the parties intended that where the only applicants were technically ineligible, promotions would be governed by other provisions of the agreement, namely, priority for the employees "with the greatest seniority * * * provided such employees have the skill and ability to perform the job involved in a satisfactory manner".

A construction of the contract in the manner suggested by the first interpretation compels the conclusion that when the union entered into the agreement it intended to bargain away vital promotion rights; that the union intended to give management the privilege of avoiding the seniority and merit promotion provisions of the contract by the simple expedient of creating new positions during those six-month periods when none of its employees would be eligible to fill them. To so construe the agreement is to conclude that the parties intended to clothe the company with freedom to act unilaterally in the significant and sensitive area of job promotion.

The arbitrator did not so conclude. He found that it was the intention of the parties that both the company and the union would participate in the consideration of promotions under such circum-

---

30. Under the arbitrator's interpretation of Article XIX it is immaterial that McGill was hired as a new employee on September 30. He was hired for a position that had to be posted ("Whenever * * * a permanent vacancy occurs, or a new job is created, notice of such job shall be posted. * * *"); and the six-month no-transfer clause relating to ineligibility refers to both "employees who have applied for such new jobs" and those who "have been assigned to fill such jobs". See Webster, Third New International Dictionary, Unabridged: "apply * * * to make an appeal or a request * * * [for example, (apply) to an employer for a job]".

Although the Company disagreed with the arbitrator's interpretation of the six-months' clause, it admitted that the promotion of McGill was inconsistent with that section of Article XIX relating to promotions between families of jobs. See footnote 28, supra.

31. We do not agree, however, that the arbitrator is confined in his interpretation to the application of one specific contractual provision while excluding the remainder of the contract and all other relevant considerations. Under well-established canons of interpretation and construction, effect must be given to all parts of the instrument. Nor do we agree that the District Court was correct in isolating one phrase of the eligibility clause to reach its conclusion that the contract language was clear and unambiguous. In ascertaining whether language is clear and unambiguous the court must look to more than one detached section of the contract; it must consider: (1) the surrounding circumstances, prior negotiations, all relevant incidents bearing on the intent of the parties; (2) who prepared the instrument; (3) the relative bargaining position of the parties; (4) the doctrine of practical construction; and (5) the main purpose of the contract. Williston, Interpretation and Construction of Contracts, Ch. 22, § 600A. See H. K. Porter Co., Inc. v. United Saw, File & Steel Products Workers of America, etc., 333 F.2d 596, (3 Cir. 1964) where we concluded that language which was ostensibly "clear and unambiguous" was qualified and contradicted by the past practices of the parties.

stances by reference to other portions of the agreement.

We must now determine whether the collective bargaining agreement is capable of this interpretation. To pursue this inquiry, it is necessary to examine first, the canons of contract construction and secondly, the "new common law —the common law of a particular industry or of a particular plant".[32]

It is generally stated that the fundamental or paramount question in the legal construction of all contracts is a determination of the real intention of the parties. Williston, Interpretation and Construction of Contracts, Ch. 22, § 601; 17A C.J.S. Contracts § 295. A contract must be construed as a whole and wherever possible, effect will be given to all its parts. Williston, Ch. 22, § 619; 17A C.J.S. Contracts § 297.[33] A construction which renders performance of the contract possible will be adopted, rather than one which renders its performance impossible or meaningless, unless the latter construction is absolutely necessary. 17A C.J.S. Contracts § 318.[34] Where ambiguity exists, the minor provisions must be construed as not to conflict with the main purpose of the contract. Williston, Ch. 22, § 619.

In addition to these broad rules of general contract construction, a collective bargaining agreement must be viewed in the context of what the Supreme Court has characterized as "the industrial common law". In United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, 363 U.S. at 581–582, 80 S.Ct. at 1352, the Court stated it thusly: "The labor arbitrator's source of law is not confined to the ex-

press provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it."

This court, speaking through Chief Judge Hastie, has recently said: "We recognize that the enforcement of collective bargaining agreements, under section 301(a) 'calls into being a new common law' * * * which in some aspects is fashioned 'from the policy of our national labor laws'." Nedd v. United Mine Workers of America, 400 F.2d 103, 105 (3 Cir. 1968).

The arbitrator could have reasonably concluded that the purpose of the prohibition against bidding for a new job within six months of entry into a prior one was to install some measure of job stability and that stability in job classification is a desire of management. It permits continuity in operations without unnecessary interruptions in plant processes; it minimizes interference with quality and quantity of production caused by constant shifting of personnel. Filling a new or vacant position with another employee of a lesser grade could conceivably cause a chain reaction of job shifting. Thus, filling a job in grade A from an employee in grade B creates a vacancy in B, to be filled by C, in turn creating a vacancy in C, and so on down the line. The six-months-in-grade requirement fulfills still another desire of management: it develops special expertise from job experience which tends to increase productivity and to insure quality. High productivity and good quality, with resultant improvement in earnings, are certainly legitimate objectives of sound management.

---

32. United Steelworkers of America v. Warrior and Gulf Navigation Co., 363 U.S. 574, 579, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

33. See Restatement of Contract, § 236 (a): "An interpretation which gives a reasonable, lawful and effective meaning to all manifestations of intention is preferred to an interpretation which leaves a part of such manifestations unreasonable, unlawful or of no effect. (b) The princi-

ple apparent purpose of the parties is given great weight in determining the meaning to be given to manifestations of intention or to any part thereof."

34. See, e. g., Liberty Nat. Bank & Trust Co. v. Bank of America Nat. Trust & Sav. Ass'n, 218 F.2d 831 (10 Cir. 1955); Northern Pac. Ry. Co. v. United States, 70 F.Supp. 836 (D.C.Minn.1946), aff'd. 188 F.2d 277 (8 Cir. 1951).

The arbitrator could have concluded that the six-month provision was not inserted in the collective bargaining agreement at the insistence of the union representatives, for theirs is an objective separate and apart from that of management. They seek to obtain the highest wage commensurate with productivity, the best working conditions, and the maximum security for their membership. These, too, are legitimate objectives.

The purpose of this provision, the function that it serves, and the reasons for its existence in the agreement—all bear on the basic canon of contract construction: a determination of the intention of the parties when they entered into the agreement.[35] And if the arbitrator found that this was a management-oriented provision, the extremely narrow issue then facing him was to decide the effect upon other provisions of the collective bargaining agreement in those instances when management consciously and deliberately waived its own provision in order to give the job to McGill.

The arbitrator could have reasoned that because both the union and management were insisting upon awarding the job to a person made technically ineligible by one provision of the agreement, in effect, both were waiving not only this one provision but all other provisions of the collective bargaining agreement as well. The subject matter thus being removed from the purview of any provisions of the agreement, it had to be considered as one reserved to management prerogatives exclusively and, accordingly management was free to name McGill.

The arbitrator could have adopted another line of reasoning: that the act of departing from the terms of the agreement was initiated by management only, in awarding the job in the first instance to McGill; that in so doing, management was waiving a management-oriented provision only; that from this unilateral action on the part of management the conclusion can neither be compelled nor reasonably inferred that the parties intended a mutual waiver—by both management and the union—of all other provisions of the agreement. Accordingly, although management had the privilege of waiving the six-month requirement, all other provisions had to be given full force and effect.[36]

The first rationale set forth above was essentially that utilized by the District Court in vacating the award; the second rationale could have been attributed to the arbitrator. It is not within the province of a reviewing court to agree or to disagree with the conclusion reached or with the specific reasoning employed. Our sole function is to decide whether the arbitrator's interpretation met the test which the courts must apply in exercising the limited function of review in cases arising from labor arbitration.

██ The arbitrator's award in the case at bar can indeed be drawn from what the Supreme Court in *Enterprise* described as the labor arbitrator's source of law: the express provisions of the contract and the tenets of industrial common law. It can be. justified on the grounds that he construed the agreement as a whole, that he gave it a construction rendering performance of the contract possible rather than one which rendered its performance impossible or meaningless, and that his interpretation gave a reasonable and effective meaning to

---

35. The policy or purpose of a statute is often the best guide to its true meaning. The same may be said of provisions in a collective bargaining agreement. Cox, Reflections Upon Labor Arbitrations, 70 Harv.L.Rev. 1482, 1504 (1959).

36. There is no surer way to find out what the parties intended than to examine what they have done. Williston, supra, Ch. 22, § 623; Atlas Trading Corp. v. Gross-

man, 169 F.2d 240 (3 Cir. 1948). Where the actions of labor and management suggest an interpretation that qualifies the written language of the basic document it is incumbent upon the arbitrator to give credence to such acts. When the company awarded the position to McGill, despite its admission that he, too, was ineligible, it indicated quite clearly that reasonable flexibility was intended.

the manifestations of intention of the parties considered against the backdrop of practices of industry and the shop.

We cannot say that his award flies in the face of any rational interpretation of the collective bargaining agreement, viewed in the light of the criteria we have discussed heretofore in detail. Accordingly, we hold that judicial interference with the arbitrator's award was not proper.

The judgment of the District Court will be reversed and an appropriate judgment entered in favor of the appellants.